AO 91 (Rev. 11/82)

# CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA<br>v.<br>ARMAN GABAEE,<br>also known as "Arman Gabay" | DOCKET NO. |
|---|---|
| | MAGISTRATE'S CASE NO.<br>18MJ 01149 |

| Complaint for Violation of Title 18, United States Code, Section 666(a)(2) |
|---|

| NAME OF MAGISTRATE JUDGE<br>**ALEXANDER F. MacKINNON** | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Los Angeles, CA |
|---|---|---|

| DATE OF OFFENSE<br>December 20, 2016 | PLACE OF OFFENSE<br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

FILED
CLERK, U.S. DISTRICT COURT
MAY 1 0 2018
CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

[18 U.S.C. § 666(a)(2)]

On or about December 20, 2016, in Los Angeles County ("County"), within the Central District of California, defendant ARMAN GABAEE, also known as "Arman Gabay," corruptly gave, offered, and agreed to give a thing of value, that is, $1,500 in United States currency, to Cooperating Witness 1 ("CW1") intending to influence and reward CW1 in connection with a transaction and series of transactions of the County involving $5,000 or more, namely, the awarding of one or more County contracts.

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit, which is incorporated as part of this Complaint.)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>BRIAN C. ADKINS    /s/ |
|---|---|
| | OFFICIAL TITLE<br>Special Agent, Federal Bureau of Investigation |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1)<br>**ALEXANDER F. MacKINNON** | DATE<br>5/10/2018 |
|---|---|

(1) See Federal Rules of Criminal Procedure 3 and 54

AUSAs Ruth C. Pinkel (x6077) and Lindsey Greer Dotson (x4443)        REC: Detention

# Table of Contents

I.    INTRODUCTION ............................................. 1

II.   PURPOSE OF AFFIDAVIT ..................................... 1

III.  SUMMARY OF PROBABLE CAUSE ............................... 2

IV.   STATEMENT OF PROBABLE CAUSE ............................. 3

      A.    Background ........................................ 3

      B.    GABAEE Begins Paying Bribes to CW1 for
            County Leases, Non-Public County Information,
            and Other Benefits ............................... 5

      C.    During a Recorded Meeting, GABAEE Pays CW1
            a $1,500 Cash Bribe in Exchange for Official
            Acts Related to GABAEE's Hawthorne Mall
            Development Project .............................. 7

      D.    During a Recorded Meeting, GABAEE Pays CW1
            Another $1,500 Cash Bribe in Exchange for
            Official Acts Related to GABAEE's Hawthorne
            Mall Development Project ......................... 12

      E.    During a Recorded Meeting, GABAEE Pays CW1
            a $1,000 Cash Bribe and Offers to Purchase
            a Ranch in Northern California for CW1 in
            Exchange for Official Acts Related to GABAEE's
            Hawthorne Mall Development Project ............... 14

      F.    During a Recorded Meeting, CW1 and GABAEE
            Discuss Details Regarding GABAEE's Proposal
            to Purchase a Property in Northern California
            as a Bribe for CW1 .............................. 15

      G.    During a Recorded Meeting, GABAEE Pays CW1
            Another $1,000 Cash Bribe and Says That He
            Is Looking "Hot and Heavy" for a Property
            in Northern California for CW1 .................. 17

      H.    Following His Meeting With CW1, GABAEE
            Immediately Attempts to Locate a Property
            in Northern California .......................... 21

      I.    GABAEE Says That He Met with the "County"
            and That CW1 Is Going to "Push" to Get the
            DPSS Lease Signed ............................... 23

      J.    GABAEE Gives CW1 Real Estate Listings for
            Northern California Properties Valued at
            Around $1,000,000 ............................... 24

K.    GABAEE Tells a Local Official That He "Took Care of the County" and Expects to Receive a "New Lease" ..................................... 25

L.    GABAEE Offers to Purchase the Barnes Road Property, Listed for $1,199,000, in Northern California for CW1 ............................... 26

M.    CW1 Tells GABAEE the DPSS Lease for the Hawthorne Mall Is Forthcoming and Inquires About the Status of GABAEE's Offer to Purchase the Barnes Road Property ......................... 28

N.    GABAEE Tells CW1 That the Barnes Road Property Is Already in Escrow and Offers to Purchase Another Property in Northern California for CW1 Instead ........................................ 29

O.    During a Recorded Meeting, GABAEE and CW1 Discuss the Status of the DPSS Lease for the Hawthorne Mall and GABAEE's Offer to Purchase a Property in Northern California for CW1; GABAEE Pays CW1 a $900 Cash Bribe ................. 30

P.    CW1 "Push[es] Hard" to Get the 10-Year DPSS Lease for GABAEE; GABAEE Is Thankful and Continues to Try to Purchase a Property in Northern California for CW1 ...................... 32

Q.    CW1 Hands GABAEE the $45 Million DPSS Lease for the Hawthorne Mall; GABAEE Responds by Telling CW1 That He Is Making an Offer to Purchase the $1,095,000 Annadel Heights Property in Northern California for CW1 .......... 36

R.    GABAEE Makes Two Offers to Purchase the Annadel Heights Property as a Bribe for CW1 ....... 40

V.    CONCLUSION .......................................... 42

## AFFIDAVIT

I, BRIAN C. ADKINS, being duly sworn, declare and state as follows:

### I. INTRODUCTION

1.    I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), and have been so employed since June 2010.  I am currently assigned to a public corruption squad. During my employment with the FBI, I have received training on the investigation of public corruption and other white collar crimes and have participated in multiple investigations of public officials, including investigations involving bribery, extortion, mail and wire fraud, and obstruction of justice.  I have conducted covert investigations of public officials, including by conducting physical and electronic surveillance.  I have served as the affiant for affidavits seeking authorization to intercept wire communications and monitored the interception of wire communications.  I have questioned suspects and witnesses, served as the handling agent for confidential sources or informants, conducted financial analyses, reviewed and seized evidence, and executed search and arrest warrants.  I have also served as an affiant for a complaint affidavit and arrest warrant.

### II. PURPOSE OF AFFIDAVIT

2.    This affidavit is made in support of a criminal complaint against, and arrest warrant for, ARMAN GABAEE, also known as Arman Gabay ("GABAEE"), for a violation of 18 U.S.C. § 666(a)(2) (Federal Program Bribery).

3.   The facts set forth in this affidavit are based upon my personal observations, my involvement in this investigation, information obtained from various law enforcement personnel and witnesses, and my training and experience.   This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and arrest warrant and does not purport to set forth all of my knowledge of the investigation into this matter.   Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III. SUMMARY OF PROBABLE CAUSE

4.   Based on my personal observations, my involvement in this investigation, information obtained from various law enforcement personnel and witnesses, and my training and experience, I am aware that GABAEE is a real estate developer who, for over six years, paid a County of Los Angeles ("County") employee cash bribes of approximately $1,000 each month in exchange for County leases, non-public information, and other benefits.   That employee, also known as Cooperating Witness 1 ("CW1"), consensually recorded multiple bribe payments from GABAEE.

5.   In addition, GABAEE offered to purchase a residential property in Northern California, listed at over $1,000,000, as a bribe for CW1.   GABAEE offered this bribe in exchange for CW1's assistance securing a $45 million County lease for GABAEE's Hawthorne Mall Development Project.   Based on recorded meetings, intercepted communications obtained pursuant to two federal

wiretap orders, and my involvement in this investigation, I know that GABAEE sought to have the County rent space for the Department of Public Social Services ("DPSS"), as well as other County departments and/or agencies, in the Hawthorne Mall, which GABAEE owned through one of his companies.  GABAEE eventually placed two offers on a residential property in Northern California, listed for $1,095,000, in exchange for CW1 helping to secure the $45 million DPSS lease for GABAEE, among other things.

## IV. STATEMENT OF PROBABLE CAUSE

### A.    Background

6.    Based on my involvement in this investigation, I am aware that GABAEE is a real estate developer who conducts business with the County and other local governments.  GABAEE is the co-managing partner and co-founder of the Charles Company. According to its website[1], which I have reviewed, the Charles Company is a real estate development company that develops and maintains commercial and residential real estate projects, including shopping malls and buildings leased to the County. The website touts the Charles Company as a "real estate development partnership unlike any other."  According to the website, GABAEE "has many valued relationships with numerous public and private tenant entities, creating a receptive tenant base for Charles Company projects."

7.    Based on my involvement in this investigation and

---

[1] http://www.charles-company.com/company-profile/ (last visited on or about May 4, 2018).

conversations with CW1, I am aware that CW1 was a public

official employed by the County during the events referenced in

this affidavit.[2]  CW1's duties involved negotiating leases

between private building and property owners and various County

departments.  CW1 was also able to request and receive proposals

from private real estate developers who wanted to lease their

buildings to County departments.  Once a property was identified

for a County department in need of space, CW1 was able to

negotiate lease terms and draft lease agreements for the County

and private property owners, or direct others to do so.  Based

on CW1's level of seniority, CW1 had significant autonomy to

contractually bind the County.  Furthermore, in CW1's capacity

as a public official employed by the County, CW1 owed a

---

[2] According to the National Crime Information Center, as of
May 8, 2018, CW1 has no criminal history.  CW1 agreed to
cooperate in this investigation, because CW1 wants the federal
government to take CW1's cooperation into consideration when
addressing certain illegal acts CW1 has admitted to committing.
CW1 has acknowledged accepting numerous bribe payments from
GABAEE and others.  CW1 also has acknowledged committing, or
attempting to commit, bankruptcy fraud and tax fraud in the
past.  Furthermore, I am aware that CW1's employer suspended
CW1, in part, because CW1's employer believes CW1 had an
inappropriate relationship with at least one real estate
developer.  CW1 retired after the suspension.  CW1 has admitted
to lying to FBI Special Agents in regard to this investigation
prior to CW1's cooperation with the FBI.  At the beginning of
CW1's cooperation, FBI Special Agents believed CW1 may have
withheld information.  On one occasion, during a debrief of CW1,
FBI Special Agents noticed the scent of marijuana emanating from
CW1's vehicle.  The FBI has not paid CW1 any money, nor has the
FBI promised to pay money in exchange for CW1's cooperation.
Despite my belief that CW1 may have withheld information in the
past, I have found the information CW1 has provided me about
GABAEE to be reliable, because much of it has been corroborated
by my investigation, recorded conversations, and phone records.
Additionally, although it appears CW1 may have withheld
information, I have no reason to believe that CW1 is fabricating
the incriminating information CW1 has provided to the FBI.

fiduciary duty to the citizens of the County and CW1's employer to perform the duties and responsibilities of CW1's office free from bias, conflicts of interest, self-enrichment, self-dealing, concealment, deceit, fraud, kickbacks, and bribery.

8.     According to CW1, and based on open source database searches including the Los Angeles County Board of Supervisors (the "Board") meeting minutes, I am aware that the United States government provides federal assistance to various County departments, including DPSS, every year---a portion of which is used to cover some of the County departments' lease expenses. The aggregate amount of federal funding received by those County departments exceeds $10,000 per year.

**B.     GABAEE Begins Paying Bribes to CW1 for County Leases, Non-Public County Information, and Other Benefits**

9.     Based on my conversations with CW1, I am aware that, sometime between 2000 and 2005, GABAEE began to seek improper assistance from CW1 in the course of conducting his (GABAEE's) real estate business with the County.  During this time, GABAEE had a lease pending approval before the Board.  The lease called for DPSS to occupy a portion of the Hawthorne Mall, which GABAEE owned.  The Board ultimately voted to approve the lease, but the approval came over a year after it was initially presented to the Board.  CW1 believed that the delay on the DPSS Hawthorne Mall lease served as the catalyst for GABAEE to seek influence and non-public County information about County leases from CW1. GABAEE did not compensate CW1 for assistance and non-public County information at this time.

10. Based on my conversations with CW1, I am aware that, in approximately 2010 or 2011, GABAEE began giving cash payments to CW1. From around that time, to on or about April 11, 2017, GABAEE gave CW1 monthly cash payments of approximately $1,000, if not more. The relationship between CW1 and GABAEE changed shortly after CW1 began accepting these monthly payments. It went from that of a friendship to an improper business relationship, wherein CW1 would provide assistance to GABAEE in return for GABAEE's monthly payments.

11. According to CW1, the assistance that CW1 provided to GABAEE in return for the $1,000 monthly payments included the following: (a) CW1 providing non-public County information to GABAEE; (b) CW1 giving added attention to, and performing official acts for, GABAEE with regard to GABAEE's existing and potential leases with the County[3]; and (c) CW1 "running interference" between GABAEE and various County departments leasing space from GABAEE where issues have arisen within the occupied properties.[4]

---

[3] Based on conversations with CW1, I am aware that CW1 received proposals in the past that were in direct competition with GABAEE's. CW1, however, did not have a similar relationship with the individuals submitting the competing proposals and therefore did not provide the same level of attention to those individuals that CW1 gave to GABAEE.

[4] CW1 recalled a meeting he had in approximately 2011 with GABAEE and another individual from the Charles Company, in which they discussed the fact that the Charles Company was receiving millions of dollars in County lease payments, but they (GABAEE and the other individual) were not fixing small problems that had arisen with the properties. The problems included items such as broken elevators and roof leaks. Instead of incurring repair costs, GABAEE relied heavily on CW1 to address the issues

C.    **During a Recorded Meeting, GABAEE Pays CW1 a $1,500 Cash Bribe in Exchange for Official Acts Related to GABAEE's Hawthorne Mall Development Project**

12.    On or about December 16, 2016, CW1 began cooperating with the federal government and agreed to record conversations with GABAEE and others.[5]

13.    On or about December 19, 2016, CW1 placed a consensually recorded outgoing telephone call, utilizing the FBI's iTacc system[6], to GABAEE's Phone[7] to schedule a meeting

---

with the departments occupying the properties by deflecting blame away from GABAEE and onto independent contractors.

[5] Descriptions of recorded conversations are summaries based on my review of the recordings, understanding of the context of the recorded conversations, knowledge of this case, and my training and experience.  These descriptions are not based on a final, verbatim transcript, and at times, I have included draft excerpts transcribed by myself and FBI Special Agent Michael Torbic ("SA Torbic").  I have placed my understanding of what is being said in brackets within the quotes.  In addition, where a portion of a conversation was unintelligible to me at the time, I have indicated as such with "UI."  Since this affidavit is offered for a limited purpose, I have not included a description of every topic discussed or every statement contained in the recorded conversations.

[6] The FBI's iTacc system allows the consenting party to call a central switchboard to place outgoing phone calls that are consensually recorded and later reviewed by the FBI.  Either I or SA Torbic reviewed all phone calls referenced herein that utilized the iTacc system.  For calls placed before December 28, 2016 that utilized the iTacc system, either I or SA Torbic confirmed through toll records that the phone call was made to GABAEE's Phone.  For calls placed on or after December 28, 2016, either I or SA Torbic confirmed through pen register data that the phone call was made to GABAEE's Phone.  The FBI obtained the pen register data pursuant to an order signed by the Honorable Frederick F. Mumm in No. 16-2516M authorizing the installation and use of a pen register and trap and trace device on GABAEE's Phone.

[7] I am aware that the telephone number dialed belongs to GABAEE based on my review of subscriber records and involvement in this investigation.  Throughout this investigation, I have also become familiar with GABAEE's voice and recognize his voice

between CW1 and GABAEE for the following day.  During the
telephone call, the following conversation took place:

> AG[8]: Hi [CW1].
>
> CW1: Hey, buddy.  What's going on?
>
> AG:  Not much, man.  How are you doing?  Are you in town?
>
> CW1: Busy.  Yeah, I'm in town.  I'm not going anywhere.
> What's the chance to get together tomorrow?
>
> AG:  Yeah, I gotta catch up with you, you know.  So I want
> to talk to you regarding uh...regarding
> uh...Hawthorne.  Things have heated up and...we need
> to see what we can do, go, go, go and get that lease
> going.

14.  Based on my conversations with CW1, review of this
conversation, and involvement in this investigation, I believe
that GABAEE was seeking a long-term lease with the County,
wherein the County would lease space for DPSS in the Hawthorne
Mall, which GABAEE owned and was redeveloping through one of his
companies.[9]  When GABAEE said that he wanted to "get that lease
going," I understand that he wanted the County to lease space
for DPSS in the Hawthorne Mall.  I believe GABAEE wanted to
"catch up" with CW1 in order to give CW1 the monthly bribe
payment and to get CW1's assistance to secure the DPSS lease,

---

on the recorded telephone calls referenced throughout this
affidavit.

[8] "AG" refers to GABAEE.

[9] The County had previously leased space for DPSS and the
Department of Community and Senior Services in or around the
Hawthorne Mall; however, that lease was set to expire in or
around August 2017.  As such, GABAEE was seeking a new lease
with the County for those departments.

among other things.  CW1 and GABAEE agreed to meet the following day, December 20, 2016.

15.  Based on my personal observations and involvement in this investigation, I am aware that, on or about December 20, 2016, the FBI provided CW1 with recording devices in preparation for CW1's meeting with GABAEE.  At approximately 11:52 a.m. that day, GABAEE arrived at CW1's office.  CW1 then exited his/her office building and got into GABAEE's car with GABAEE.

16.  Based on my review of the audio and video recording of that meeting and conversations with CW1, I am aware that CW1 and GABAEE began discussing GABAEE's Hawthorne Mall Development Project and the fact that GABAEE had drawn up development plans for the project, which I believe GABAEE handed to CW1 during this meeting.  During their conversation, the following exchange took place:

CW1: The problem with these, with these proposals is...we don't have any approved SREs [Space Request Evaluations] or anything like this...

AG:  That's what I'm saying, you need to get the SREs...

CW1: ...the departments got to get their act together.

AG:  ...that's what I'm talking about.

CW1: Well, I can ask the departments to do that.

AG:  That's all I'm asking, nothing else.

CW1: So, that's all I can do.

AG:  That's all I'm asking.  I'm not asking for anything else right now.

17.  Based on my review of the recorded meeting, involvement in this investigation, and training and experience, I believe that GABAEE was asking CW1 to perform an official act, specifically, to get SREs from County departments.  The SREs, in turn, would allow CW1 to begin more formal lease negotiations with GABAEE.

18.  Based on my review of the audio and video recording of that meeting and conversations with CW1, I am also aware that shortly after GABAEE and CW1 discussed the Hawthorne Mall Development Project, they had the following conversation:

CW1: Thousand?[10]

AG:  You need more?

CW1: Eh, the holiday...

AG:  How much [UI]...I wasn't sure, I brought...tell me how much money.

CW1: Umm, you know, whatever...

AG:  Tell me.

CW1: ...might get something for [CW1's Daughter] or whatever...

AG:  Tell me.

CW1: Five hundred bucks.

AG:  No [UI].

CW1: No, five hundred's fine.

AG:  Sure?

CW1: Yeah.

---

[10] According to CW1 and the recording, CW1 was referring to the $1,000 GABAEE gave CW1 at this moment.

AG:     [UI] I brought more.

CW1:    I don't need more, you know, you, you've been, look,
        every month for how long, have you been, you know?

AG:     [CW1], don't worry about it...how much more do you
        need?

CW1:    Million dollars [laughs].

19.    From my review of the above exchange and conversations
with CW1, I understand that GABAEE handed CW1 $1,000 during the
meeting but then offered to increase the amount of the bribe
payment by $500.  In total, GABAEE gave CW1 $1,500 during this
meeting.[11]  I also believe that CW1's statement about GABAEE
having paid him "every month for how long" corroborates CW1's
statements to me that GABAEE had been paying him monthly bribes
for a number of years.

20.    Shortly after GABAEE had given CW1 $1,500, GABAEE
asked CW1 why CW1 appeared to be nervous.  GABAEE observed that
CW1 was not acting like his/her normal self and told CW1 not to
count the money in the open, as CW1 appeared to have been doing
at the time.  Based on my training and experience, I believe
that GABAEE was concerned about possible detection by law
enforcement, which is one of the reasons he was concerned that
CW1 was not acting normally and that CW1 was openly counting the
bribe payment in plain view.

---

[11] Following CW1's meeting with GABAEE, the FBI met CW1 and
collected $1,500 in United States currency from CW1, which CW1
said GABAEE had given CW1 during the recorded meeting.  (The FBI
searched CW1's person before this meeting and determined that
CW1 had no cash on his/her person prior to the meeting.)

D.   **During a Recorded Meeting, GABAEE Pays CW1 Another $1,500 Cash Bribe in Exchange for Official Acts Related to GABAEE's Hawthorne Mall Development Project**

21.   Based on my review of audio and video recordings and involvement in this investigation, I am aware that GABAEE and CW1 met at a restaurant in Los Angeles on or about December 30, 2016.  Based on my review of consensually recorded phone calls between GABAEE and CW1, involvement in this investigation, and training and experience, I believe that GABAEE wanted to meet with CW1 to discuss, among other things, the Hawthorne Mall Development Project and also to alleviate GABAEE's concerns about CW1's demeanor during their prior meeting.

22.   Shortly after the meeting began, GABAEE gave CW1 $1,000 and asked CW1 whether CW1 needed "any more" money.  Later in the meeting, GABAEE gave CW1 another $500.  Based on my training and experience and involvement in this investigation, I believe that GABAEE gave CW1 $1,500 as part of his continuing bribe payments to CW1 in exchange for official acts related to the Hawthorne Mall Development Project, among other things.[12]

23.   A short time later, during the same recorded meeting, CW1 and GABAEE had the following exchange regarding GABAEE's Hawthorne Mall Development Project and the potential for future County leases within the mall, including the DPSS lease:

CW1: When are you pulling your permits on Hawthorne?

--------

[12] Following CW1's meeting with GABAEE, the FBI met CW1 and collected $1,500 in United States currency from CW1, which CW1 said GABAEE had given CW1 during the recorded meeting.  (The FBI searched CW1's person before this meeting and determined that CW1 only had $5 in cash on his/her person prior to the meeting.)

AG:    Hawthorne, probably in three weeks. We are mobilizing, getting bids, everything.

CW1:  Well you know, I moved, I've been trying...

AG:    [UI] start construction by the end of January...

CW1:  Well I've been pushing, you know I had to, I put a big notice out on the street for Hawth...for Hawthorne, so that, so that it's out there so people can send stuff in. Just makes it cleaner.

AG:    No problem. Can we just start negotiating that or no?

CW1:  I don't have the SREs, I put them at the top, but I gotta get the department...

AG:    I need it, badly, I'm freakin' desperate.

CW1:  Arman, I'm trying anyway I can.

AG:    But can I, should I do anything [UI].

CW1:  No, I gotta get DPSS to respond...

24.    Based on my training and experience and involvement in this investigation, I believe GABAEE was asking CW1 to perform an official act by attempting to obtain the SRE, which would have allowed CW1 to begin more formal lease negotiations for DPSS to lease space in the Hawthorne Mall. I believe that CW1's statement that he had to put a "big notice out on the street []" for Hawthorne" to make "it cleaner" was a reference to CW1 pretending to use the normal bidding process for County leases but in reality representing to GABAEE that CW1 would give GABAEE favorable treatment.

**E.    During a Recorded Meeting, GABAEE Pays CW1 a $1,000 Cash Bribe and Offers to Purchase a Ranch in Northern California for CW1 in Exchange for Official Acts Related to GABAEE's Hawthorne Mall Development Project**

25.    Based on my review of audio and video recordings and involvement in this investigation, I am aware that GABAEE and CW1 met on or about January 27, 2017.  During this meeting, GABAEE gave CW1 $1,000.[13]  Based on my training and experience and involvement in this investigation, I believe that GABAEE gave CW1 $1,000 as part of his continuing bribe payments to CW1 in exchange for official acts related to the Hawthorne Mall Development Project, among other things.

26.    During this recorded meeting, GABAEE also referenced the purchase of a property in Northern California, specifically a "ranch."  The following exchange took place:

AG:    How's uhh...for the Northern Cal, should I start looking or...

CW1:    No, don't do anything.

AG:    If you do Hawthorne, we can do this.  Remember you wanted to buy that ranch?

CW1:    Hahaha.

AG:    I'm serious, I'm not joking with you.  You do Pomona, it only gets better.

27.    Based on my review of this recording, conversations with CW1, involvement in this investigation, and training and experience, I believe that GABAEE was offering to purchase a

---

[13] Following CW1's meeting with GABAEE, the FBI met CW1 and collected $1,000 in United States currency from CW1, which CW1 said GABAEE had given CW1 during the recorded meeting.

property in Northern California for CW1 in exchange for CW1
helping to secure the DPSS lease for GABAEE's Hawthorne Mall
Development Project.[14]  Furthermore, I believe that GABAEE's
reference to "Pomona" was a reference to another property that
GABAEE owned in Pomona, for which he was also seeking a County
lease.  When GABAEE told CW1 that it "only gets better" if CW1
"does Pomona," I believe GABAEE was offering to give CW1 an even
bigger bribe if CW1 helped secure a lease for the County to rent
space in GABAEE's Pomona property.

> **F.   During a Recorded Meeting, CW1 and GABAEE Discuss
> Details Regarding GABAEE's Proposal to Purchase a
> Property in Northern California as a Bribe for CW1**

28.  On or about January 30, 2017, CW1 placed a recorded
telephone call, utilizing the FBI's iTacc system, to GABAEE's
Phone.  During the call, which I have reviewed, CW1 began
discussing "the Hawthorne deal" and GABAEE's offer to do
"something up North."  GABAEE immediately said that the two
should meet in person.  GABAEE said, "I don't want to talk on
the phone."

29.  Based on my training and experience, GABAEE's concern
about discussing the matter on the phone shows consciousness of
guilt, i.e. that GABAEE was concerned about law enforcement
possibly surveilling their communications and gathering evidence
of criminal activity.  In particular, I believe GABAEE did not
want to discuss the purchase of the Northern California property

---

[14] The FBI first learned of GABAEE's offer to purchase
property for CW1 after reviewing audio recordings from the
December 30, 2016 meeting.  CW1 had not previously told the FBI
about this offer.

over the phone, because he knew such a purchase would be an illegal bribe payment to CW1.

30.  Following an exchange of telephone calls over the next few days, GABAEE and CW1 eventually agreed to meet at a restaurant for breakfast on or about February 2, 2017.  The FBI provided CW1 with recording devices, and the meeting was audio and video-recorded.  I have reviewed that recording.

31.  During the recorded breakfast meeting, GABAEE and CW1 discussed the purchase of the Northern California property for CW1, in exchange for CW1 performing official acts related to GABAEE's Hawthorne Mall Development Project:

CW1: How are we going to make it work for Northern
        California?

AG:  I'm ready.  You tell me.  I'll roll my sleeves up, and
        I'll go make it work.

CW1: You have someone that can start looking?

AG:  Easy.  Not hard.

CW1: You're talking a million and a half bucks up
        there...for small acreage.  It's almost as bad as
        here.

AG:  Let me go ask my help and see what I can find.  You've
        got to give me an idea, like on a map.

CW1: Just you know, in the Santa Rosa area.

AG:  It's not that far from here.

CW1: Santa Rosa.

AG:  How far is it?  Just north of, north of Santa Barbara,
        right?

CW1: It's...no, Santa Rosa is, is an hour north of San
      Francisco.

AG:   North of it?

CW1: Yeah.

32.    Based on my review of the recordings and involvement
in this investigation, I understand that GABAEE told CW1 to
pinpoint a specific location for the property GABAEE would
purchase for CW1.  CW1 then identified "the Santa Rosa area,"
which he explained is "north of San Francisco."

33.    During this meeting, GABAEE also expressed concern
that there were cameras in the restaurant.  He said: "There's
cameras all over the fucking place.  You got...everywhere.  To
your right, to the left, to the back, to the front...there are
like fifty fucking cameras."  When CW1 said, "eh, it's just
security," GABAEE expressed concern again.  He said, "they can
read your lips."  Based on my training and experience and
involvement in this investigation, I believe that GABAEE's
concern regarding the numerous security cameras in the
restaurant again shows consciousness of guilt.  He appeared
concerned about law enforcement surveilling their meeting and
gathering evidence of GABAEE's bribe payments to CW1.

G.    During a Recorded Meeting, GABAEE Pays CW1 Another
      $1,000 Cash Bribe and Says That He Is Looking "Hot and
      Heavy" for a Property in Northern California for CW1

34.    On or about March 1, 2017, there was another audio and
video-recorded meeting between GABAEE and CW1, which I have

reviewed.  During this meeting, GABAEE gave CW1 $1,000.[15]  Based on my training and experience and involvement in this investigation, I believe that GABAEE gave CW1 $1,000 as part of his continuing bribe payments to CW1 in exchange for official acts related to the Hawthorne Mall Development Project, among other things.

35.  Based on my review of the March 1, 2017 recording, involvement in this investigation, and training and experience, I am also aware that, during this meeting, GABAEE again discussed his offer to purchase a property in Northern California for CW1, in exchange for CW1 performing official acts related to the Hawthorne Mall.  The following conversation took place:

> CW1:  ...I can push the department and Employee 1[16] to get the thing [the deal for the Hawthorne Mall] going, but I have to do it in the right fashion.
>
> AG:  No, I don't disagree.
>
> CW1:  You know, you were, uh, you were going to have your friend up North contact me or start looking.  Have you found anything?

---

[15] Following CW1's meeting with GABAEE, the FBI met CW1 and collected $1,000 in United States currency from CW1, which CW1 said GABAEE had given CW1 during the recorded meeting.  (The FBI searched CW1's person and vehicle before this meeting and determined that CW1 only had $30 in cash on his/her person and $13 in cash in his/her vehicle prior to the meeting.)

[16] Based on my involvement in this investigation, I am aware that Employee 1 was a County employee who worked for CW1.

AG:    I'm looking hot and heavy.  There's a site called foreclosures.com, that are like alert, foreclosure alert.

CW1:   Uh huh.

AG:    And I contacted this Persian lady.  She's a hit and miss.  That's all she does, you know what I'm saying?  But I have another person.  I'm gonna get more aggressive.

CW1:   Alright, well, ya know, if we're gonna move forward on Hawthorne, I wanna move forward on that [the property in Northern California].  So...

AG:    I'm ready.

       . . .

CW1:   ...let me use my influence to push them to go...

AG:    I understand.

CW1:   ...a whole new lease and get it done before August.

AG:    For the relocation?

CW1:   Just a lease in place, kind of like.  [Crosstalk.]

AG:    I'd much rather have that.

CW1:   But, you know, if I push that [the lease for the Hawthorne Mall], you gotta get going for me.

AG:    Are you kidding me?  Of course I'm gonna do that.

       . . .

       The word I put out is that I want something with a little bit of land, if we can get it.  How much land do you [UI]?

CW1:   A couple of acres, just, you know, enough.

19

AG:    One or two acres?

CW1:   Yeah, you know, I'd like to be able to throw some

       goats on there and start making cheese.    [Laughter.]

       So look, I can put a deal together and influence DPSS

       to do it, if, if it looks good on paper.

36.    Based on the above exchange, my involvement in this
investigation, and my training and experience, I understand that
GABAEE was promising to purchase a property in Northern
California for CW1 if CW1 agreed to perform certain official
acts related to the Hawthorne Mall.    Those official acts
included, but were not limited to, the following: (a) CW1
putting a "deal together" for DPSS to lease space in the
Hawthorne Mall; (b) CW1 using his/her "influence" to make DPSS
agree to the terms of the lease; (c) CW1 ensuring that the lease
was drafted in such a way that it "look[ed] good on paper,"
meaning that it did not appear suspect or raise concerns;
(d) CW1 using his/her "influence" to "push" to get the "whole
new lease" for DPSS that GABAEE wanted; and (e) CW1 using
his/her "influence" to expedite the negotiations and approval
process to secure the new lease for GABAEE by August 2017.[17]

37.    In addition, during this meeting, GABAEE reiterated
the need for secrecy in their dealings related to the Northern
California property.    The following exchange took place:

---

[17] As previously mentioned, the County had previously leased
space for DPSS and the Department of Community and Senior
Services in or around the Hawthorne Mall.    That lease was set to
expire in or around August 2017, which was part of the reason
why GABAEE wanted a new lease with the County for those
departments.

AG:    So, I'm going to start getting really aggressive with
       the North.

CW1: Alright.

AG:    I was waiting for the market to go down [UI].

CW1: Send me, send me any pictures of whatever you got.

AG:    I'll figure out how to send it to you.  I don't want
       to...have to be careful.

CW1: Eh, text it, no?

AG:    No, you have to be more careful, man.

CW1: Well, then print them off and just hand them to me.

AG:    That's what I'm gonna do.

38.    Based on the above exchange, my involvement in this
investigation, and my training and experience, I understand that
GABAEE did not want to create a traceable record of him
providing pictures of properties in Northern California to CW1.
I believe that GABAEE wanted to avoid creating a traceable
record in order to avoid detection by law enforcement, because
GABAEE knew that he was illegally offering to give CW1 a bribe
in exchange for official acts related to the Hawthorne Mall.

**H.    Following His Meeting With CW1, GABAEE Immediately
        Attempts to Locate a Property in Northern California**

39.    Shortly after the March 1, 2017 meeting, FBI Special
Agents intercepted a brief call between GABAEE and an Unknown
Female ("UF") on GABAEE's Phone.[18]  Based on my knowledge of this

---

[18] On February 28, 2017, the Honorable Manuel S. Real,
United States District Court Judge, signed an order in CR Misc.
No. 17-00230 authorizing the interception of wire communications
to and from GABAEE's Phone for a period of 30 days.  On March

case and review of the call, I believe that the UF was a realtor or someone otherwise involved in locating a property in Northern California for GABAEE to purchase for CW1.[19]   The following exchange took place[20]:

UF:   Hello, Mister Arman.

AG:   Hello, ma'am, how...

     ...

UF:   I am sorry, Mister Arman, look, I, with the girl who works out there.... Can you give me a little more information?  Exactly around Santa Rosa, meaning, what's the exact name of the area that you want to purchase?  Because Santa Rosa, meaning it's not one section that....   You are around San Francisco, is that right?

AG:   Yes, yes, yes.

UF:   Around San Francisco, can you tell me the area around there?  Or for instance, give me someone's phone

---

29, 2017, in CR Misc. No. 17-00230(A), Judge Real authorized the continued interception of wire communications to and from GABAEE's Phone for another 30 days.

[19] Descriptions of intercepted communications are summaries based on my review of the recordings, understanding of the context of the recorded conversations, knowledge of this case, and my training and experience.  These descriptions are not based on a final, verbatim transcript, and at times, I have included excerpts transcribed by myself, SA Torbic, or other FBI Special Agents or staff.  I have placed my understanding of what is being said in brackets within the quotes.  In addition, where a portion of a conversation was unintelligible to me at the time, I have indicated as such with "UI."  Since this affidavit is offered for a limited purpose, I have not included a description of every topic discussed or every statement contained in the intercepted communications.

[20] This call was translated from Farsi to English.  I do not speak or understand Farsi.

> number, so I can call and ask exactly which location
> he/she is looking for?

AG:    Okay, let me ask and then let you know.

40.    Based on my involvement in this investigation, review of this call, and training and experience, I believe that GABAEE was speaking with the UF in order to locate a property in or around San Francisco or Santa Rosa as a bribe for CW1.

### I.    GABAEE Says That He Met with the "County" and That CW1 Is Going to "Push" to Get the DPSS Lease Signed

41.    The day after GABAEE's meeting with CW1, FBI Special Agents intercepted a call on GABAEE's Phone between GABAEE and an Unknown Male ("UM") on or about March 2, 2017.    GABAEE told the UM that he "met with the County yesterday" and "this guy said he will package everything and push and get our lease signed."    The UM responded, "Oh, I heard that...Len mentioned that you had had some good news about the County."

42.    Based on my review of this call, involvement in this case, and training and experience, I believe that GABAEE was referencing his meeting with CW1 the previous day and that "this guy" from the "County" was a reference to CW1.    I believe that GABAEE was explaining the official acts he expected CW1 to perform in exchange for the bribes from GABAEE.    In particular, the official acts included CW1 "packag[ing] everything" and "push[ing]" to get the County to sign a "lease" to rent space for DPSS in the Hawthorne Mall.

J.    **GABAEE Gives CW1 Real Estate Listings for Northern California Properties Valued at Around $1,000,000**

43.    On or about March 6, 2017, FBI Special Agents intercepted a call between GABAEE and Individual 1.   The following exchange took place:

IND1[21]:    Hey, I sent to [GABAEE's Assistant].[22]   I said, [GABAEE's Assistant], don't print these up, don't send an email.  Ummm, I mean, don't send it through email, but I sent [GABAEE's Assistant], umm that friend of mine, uhh Santa Rosa...sent a bunch of houses for you.

AG:    I saw it.  I got it.

IND1:    Okay, so you just need to tell me up down, you're looking for something smaller, bigger, uh...

AG:    I have a meeting with him.  I'm going to show it to him.

44.    On or about March 8, 2017, GABAEE then met with CW1 during an audio-recorded meeting.  Based on my review of this recording and conversations with CW1 following the meeting, I am aware that GABAEE gave CW1 real estate listings for approximately 13 properties located in Northern California, including Santa Rosa, during this meeting.  The list prices for the properties ranged from approximately $899,000 to $1,288,888.

---

[21] "IND1" refers to Individual 1.

[22] Based on my involvement in this case, I understand that the person to whom Individual 1 sent the real estate listings is GABAEE's assistant at the Charles Company.

45.    Based on my involvement in this investigation, review
of the recorded meeting, and training and experience, I believe
that the listings for houses in Northern California referenced
by Individual 1 during the above call are likely the same ones
GABAEE then provided to CW1.  This is, in part, because GABAEE
gave CW1 real estate listings for houses in and around Santa
Rosa following the call between GABAEE and Individual 1, and
also because GABAEE stated during the call that he intended to
"show it to him" at a "meeting with him."  GABAEE met with CW1
approximately two days after this call and handed CW1 real
estate listings for houses in and around the Santa Rosa area.
In addition, during their previous meeting on or about March 1,
2017, GABAEE said that he would "print" and "hand" to CW1
pictures of properties he located in Northern California.  The
real estate listings GABAEE gave to CW1 on or about March 8,
2017 had pictures of the properties.

46.    Furthermore, based on my involvement in this case and
training and experience, I believe that Individual 1's strict
instructions to GABAEE's Assistant not to email the listings
show efforts to conceal their activities and likely
consciousness of guilt, since emailing the listings could create
a traceable record of their actions related to the purchase of
the Northern California property.

**K.    GABAEE Tells a Local Official That He "Took Care
of the County" and Expects to Receive a "New Lease"**

47.    The day after GABAEE had given CW1 real estate
listings for approximately 13 properties in Northern California,

FBI Special Agents intercepted a call between GABAEE and Local Official 1 on or about March 9, 2017.[23] During the call, GABAEE said, "I also took care of the County." GABAEE continued, "[he/she] gave me [his/her] word of honor that [he/she] would send the lease, the new lease." Based on my training and experience and involvement in this investigation, I believe that GABAEE was referencing CW1 getting the new DPSS lease for GABAEE in exchange for the Northern California property. Specifically, when GABAEE said that he "took care of the County," I believe that was a reference to GABAEE's offer to purchase the property in Northern California as a bribe for CW1.

48.    Furthermore, during the call, GABAEE repeatedly stated that he did not want to discuss things on the phone. For instance, he told Local Official 1, "I can't tell you anything on the phone." GABAEE also said, "I'm sorry; I don't want to say it on the phone." Based on my training and experience and involvement in this investigation, I believe that GABAEE did not want to discuss his offer to purchase the Northern California property as a bribe for CW1 on the phone, because he was concerned about law enforcement surveilling his calls.

**L.    GABAEE Offers to Purchase the Barnes Road Property, Listed for $1,199,000, in Northern California for CW1**

49.    On or about March 15, 2017, there was another audio and video-recorded meeting between GABAEE and CW1. Based on my review of that recording, involvement in this investigation, and training and experience, I am aware that GABAEE and CW1

---

[23] This call was translated from Farsi to English. As stated, I do not speak or understand Farsi.

discussed GABAEE purchasing a property on Barnes Road in Santa Rosa (the "Barnes Road Property") as a bribe for CW1.

50. According to the real estate listing, which GABAEE had given to CW1 on or about March 8, 2017, as detailed above, the Barnes Road Property was located in Santa Rosa, in Northern California. The list price was $1,199,000. It had a 2,444 square-foot home on 1.28 acres of land, as well as a "pool," "horse barn," "arena," "lush gardens," and "200 acres of vineyard" surrounding the property.

51. During the March 15, 2017 recorded meeting, I am aware that GABAEE and CW1 discussed the purchase of the Barnes Road Property, in particular how title for the property would be held. GABAEE stated that the purchase "has to be in some kind of an LLC" and that GABAEE and CW1 could "have nothing to do with it." Based on my involvement in this case and training and experience, I believe that GABAEE wanted to purchase the property through a limited liability company, or "LLC," in order to disguise his ownership interest and the fact that he was purchasing the property as a bribe for CW1. In the public record, GABAEE wanted it to appear as though neither he, nor CW1, had any interest or involvement in the Barnes Road Property.

52. During this meeting, CW1 told GABAEE that he would have Employee 1 finalize and send the DPSS lease "by Friday." In response, GABAEE said, "I'll jump on this now." Based on my review of the recording and involvement in this investigation, I understand GABAEE to be saying that he is going to "jump" on

purchasing the Barnes Road Property as soon as possible in exchange for CW1's efforts to secure the DPSS lease for GABAEE.

53.  Finally, during this meeting, GABAEE again referenced the need for secrecy and confidentiality.  He told CW1, "you gotta be careful."  He warned CW1, "you speak very loudly."  He later told CW1 once more that CW1 has to be "very careful."  Based on my involvement in this case and training and experience, I believe GABAEE was concerned about others, particularly law enforcement, overhearing or uncovering GABAEE's plans to bribe CW1 with the Barnes Road Property.

### M.   CW1 Tells GABAEE the DPSS Lease for the Hawthorne Mall Is Forthcoming and Inquires About the Status of GABAEE's Offer to Purchase the Barnes Road Property

54.  On or about March 22, 2017, FBI Special Agents intercepted a call to GABAEE's Phone from CW1, which I have reviewed.  CW1 left a voicemail for GABAEE.  Based on my review of that voicemail and involvement in this investigation, I am aware that CW1 informed GABAEE that the DPSS lease for the Hawthorne Mall would be sent to GABAEE the following week.  CW1 stated that Employee 1 "[was] running a little bit behind on getting that lease for Hawthorne out" and that it "probably isn't going to make it until Monday or Tuesday."  CW1 then said that he/she was also calling "to find out if [GABAEE] [had] heard anything on, uhh, [the] property in Northern California."  Based on my involvement in this investigation, I am aware that the "property in Northern California" was a reference to the Barnes Road Property and that CW1 was inquiring about the status of GABAEE's offer to purchase that property for CW1.

55.  Later that evening, FBI Special Agents intercepted another call to GABAEE's Phone from CW1, which I have reviewed. CW1 asked whether GABAEE had received CW1's "message about not getting the lease out until Monday or Tuesday." GABAEE responded, "no problem."

**N.  GABAEE Tells CW1 That the Barnes Road Property Is Already in Escrow and Offers to Purchase Another Property in Northern California for CW1 Instead**

56.  On or about March 24, 2017, FBI Special Agents intercepted a call between GABAEE and CW1, which I have reviewed. Based on my review of the call and involvement in this investigation, I am aware that GABAEE and CW1 discussed the status of GABAEE's offer to purchase the Barnes Road Property for CW1. The following exchange took place:

AG:  I'm pretty stressed out. What's going on with you?

CW1: Nothing. I was just touching base, seeing if, if we could get together next week. See if everything is okay? See if you heard any news back on anything?

AG:  I called, I called, I called about that thing [the Barnes Road Property] and unfortunately it is in escrow. I'm trying to put a back-up [offer] on it.

CW1: Alright, well, you know. Maybe we'll just have to look at something else.

AG:  Yeah, take a look at that list. If you don't like anything on that list, let me know. I'll, I'll go find another list.

57.  Based on my review of this call, involvement in the investigation, and training and experience, I believe that the

purchase of the Barnes Road Property for CW1 did not take place because the property was already in escrow, as GABAEE noted. Although GABAEE stated that he would "try[] to put [in] a back-up [offer]" on the Barnes Road Property, he also told CW1 to "take a look at that list."  I believe "the list" was a reference to the 13 real estate listings for properties in Northern California that GABAEE had given CW1 on or about March 8, 2017.  From this exchange, I understand GABAEE to be telling CW1 that he will either place an offer on another property from that list for CW1, or if CW1 does not like the other properties on that list, GABAEE will "go find another list," meaning that he will obtain additional real estate listings for CW1 to review.

   O.   **During a Recorded Meeting, GABAEE and CW1 Discuss the Status of the DPSS Lease for the Hawthorne Mall and GABAEE's Offer to Purchase a Property in Northern California for CW1; GABAEE Pays CW1 a $900 Cash Bribe**

   58.   On or about March 30, 2017, FBI Special Agents intercepted a call to GABAEE's Phone from CW1, which I have reviewed.  CW1 left a voicemail for GABAEE.  CW1 stated that he/she was trying to get a hold of GABAEE to "touch base tomorrow on Hawthorne...and maybe Northern California."  Based on my involvement in this case, I understand "Hawthorne" to be a reference to GABAEE's Hawthorne Mall Development Project.  I also understand "Northern California" to be a reference to the property in Northern California that GABAEE offered to purchase for CW1 in exchange for CW1 performing official acts related to the Hawthorne Mall.

59. In a subsequent intercepted call, which I have reviewed, GABAEE and CW1 agreed to meet the following morning on or about March 31, 2017 at a restaurant for breakfast. Based on my involvement in this investigation, I am aware that the FBI provided CW1 with recording devices just prior to CW1's breakfast meeting with GABAEE.

60. I have reviewed the audio and video-recordings of the March 31, 2017 breakfast meeting. Among other things, GABAEE and CW1 discussed the DPSS lease for the Hawthorne Mall. CW1 told GABAEE that the County was "slowing down" for the time being on the DPSS lease for the Hawthorne Mall due to financial concerns. CW1 explained, "the State is pulling 150 to 500 million dollars from DPSS's programs starting this year, and they're concerned that the Feds are going to pull funding." Rather than sign a long-term lease, CW1 told GABAEE that the County wanted to sign a two-year lease instead. GABAEE was not pleased with this development. Later in the meeting, GABAEE said that this development was "really disappointing" and was putting him in a "bad position." He said that he might have to go directly to a particular high-ranking elected official for assistance securing the long-term DPSS lease for the Hawthorne Mall.

61. During the same conversation, GABAEE and CW1 also discussed the Northern California property. GABAEE suggested that CW1 "go there" (to Northern California) in order to "meet with the broker" directly and "see something." CW1 offered to look for properties too. They both agreed that properties in

Northern California were selling quickly, so it was important to "respond fast," as CW1 said, if either of them located a suitable property for GABAEE to purchase.

62.  Finally, at the end of the meeting, GABAEE told CW1 to go to the restroom and then, in the restroom, gave CW1 $900. GABAEE said, "I'm one hundred dollars short." Based on my involvement in this case and training and experience, I believe that GABAEE gave CW1 $900 as part of his continuing bribe payments to CW1 in exchange for official acts related to the Hawthorne Mall Development Project, among other things.[24]  I believe GABAEE said that he was a "hundred dollars short," because the monthly bribe payments were usually $1,000 or more. Furthermore, I believe that GABAEE told CW1 to go to the restroom for the exchange of the bribe payment in an effort to, among other things, avoid detection by law enforcement.

**P.   CW1 "Push[es] Hard" to Get the 10-Year DPSS Lease for GABAEE; GABAEE Is Thankful and Continues to Try to Purchase a Property in Northern California for CW1**

63.  On or about April 6, 2017, FBI Special Agents intercepted a call between GABAEE and CW1, which I have reviewed. CW1 told GABAEE that CW1 had "good news." "I stuck my neck out, pushed hard, had a meeting yesterday," CW1 said. "Hawthorne can move forward," CW1 stated. "I'm gonna move forward with the 10-year." GABAEE responded, "I can't thank you

---

[24] Following CW1's meeting with GABAEE, the FBI met CW1 and collected $900 in United States currency from CW1, which CW1 said GABAEE had given CW1 during the recorded meeting.  (The FBI searched CW1's person before this meeting and determined that CW1 only had $42 in cash on his/her person prior to the meeting.)

enough." Based on my involvement in this investigation, I am
aware that GABAEE wanted the County to enter into a long-term
lease, whereby DPSS would rent space in the Hawthorne Mall for
10 years. As such, this appeared to be "good news" for GABAEE,
as CW1 said, particularly after their last meeting when CW1
broke the news that the County, at that time, had only wanted a
two-year lease.

64. After conveying the "good news" to GABAEE that CW1
"pushed hard" and would be able to "move forward with the 10-
year [lease]" for GABAEE, CW1 and GABAEE discussed GABAEE's
efforts to purchase a property in Northern California for CW1.
GABAEE said, "I am fully engaged on that." Based on my
involvement in this investigation, I believe that GABAEE was
reassuring CW1 that he was working hard to find a property in
Northern California to purchase for CW1, in exchange for CW1's
efforts to secure the DPSS lease for GABAEE.

65. Shortly after this conversation, FBI Special Agents
intercepted a call between GABAEE and Individual 1, which I have
reviewed. GABAEE and Individual 1 discussed the urgent need to
locate a property in Northern California to purchase. GABAEE
told Individual 1 to see if "there's a way we can get that
house." Based on my involvement in this investigation and
review of this call, I understand "that house" to be a reference
to the Barnes Road Property that GABAEE had offered to purchase
for CW1 but which had already gone into escrow with a different
buyer. Individual 1 told GABAEE that the Barnes Road Property
already had a back-up offer and had sold. Individual 1 promised

to keep GABAEE informed about any other properties that might
become available. GABAEE urged Individual 1 to be discrete,
telling Individual 1 that he wanted "this to be confidential."
Based on my involvement in this case and training and
experience, I believe that one of the reasons GABAEE wanted to
keep the matter "confidential" was because he knew that
purchasing the property in Northern California as a bribe for
CW1 was illegal and he wanted to avoid detection by law
enforcement.

66. The following day, on or about April 7, 2017, FBI
Special Agents intercepted a call between GABAEE and Individual
1, which I have reviewed. Individual 1 conveyed some "good
news" to GABAEE---Individual 1 had found another property in
Santa Rosa that GABAEE could purchase. The following exchange
took place:

IND1:    Hey, I have some other good news for you. I think I
         found another property in Santa Rosa. Um...

AG:      Okay.

IND1:    I sent it to [GABAEE's Assistant], and said, "Hey,
         make sure you show this to Arman." Uh, as I'm
         rushing back from Sacramento just trying to take a
         look at it, but when you get in the office, if you
         could take a peak at it, see if you think I should,
         uh, keep looking at it. Let me know.

AG:      Fuck it. If you think it is a good property, tie it
         up. Make the offer.

IND1:    Yeah, that's...

AG:      Make the offer.

IND1:    Yeah, that's what I mean.  I'm gonna...I want to see
         it.  I'm on my way back from Sacramento.  I'm gonna
         go see it.

AG:      Well, it's holding up a couple of things.  I need to
         buy this as soon as possible.

         . . .

AG:      ...if you think it's good, buy it up.

IND1:    I think it's better than the other property [the
         Barnes Road Property].

AG:      Okay, then tie it up.

IND1:    Okay.

AG:      Make the offer.  Have him make the offer.  It can't
         be under my name, unfortunately, but we'll figure
         out.

IND1:    What entity did you want to put it in?

AG:      Uh, do you have any entity you can sign for, or uh,
         you can put the assignee, and I'll take it into
         assignment.

IND1:    Yeah, I'll work something out.  I'll work something
         out.

AG:      If you don't mind, go ahead.  How much is it?

IND1:    I think it's, uh, a million bucks.  A million...a
         million zero twenty-six.  Something like that...

         . . .

AG:      Go ahead and make the offer ASAP.

67.  Based on my review of this call, involvement in this

investigation, and training and experience, I believe the above
call between GABAEE and Individual 1 was about purchasing
another property in Santa Rosa as a bribe for CW1 in exchange
for, among other things, CW1 helping to obtain the DPSS lease
for GABAEE's Hawthorne Mall Development Project.  GABAEE later
told Individual 1 during the conversation that they had to keep
the purchase "very, very confidential."  Based on my training
and experience and the fact that GABAEE was attempting to
purchase the property not "under [his] name," I believe that
GABAEE wanted to keep the purchase "very, very confidential" in
order to conceal the fact that he was illegally attempting to
purchase this property as a bribe for CW1.

     **Q.    CW1 Hands GABAEE the $45 Million DPSS Lease for the
          Hawthorne Mall; GABAEE Responds by Telling CW1 That He
          Is Making an Offer to Purchase the $1,095,000 Annadel
          Heights Property in Northern California for CW1**

     68.    On or about April 10, 2017, FBI Special Agents
intercepted a call between GABAEE and CW1, which I have
reviewed.  GABAEE told CW1, "I made an offer on something."  CW1
asked, "you saw something that looked good?"  GABAEE responded,
"Yeah, I told them today to go ahead and make the offer; I don't
want to lose it the second time."  Based on my involvement in
this investigation, I believe that GABAEE was telling CW1 that
he was making an offer on the property that Individual 1 had
recently located in Santa Rosa.  When GABAEE said that he did
not "want to lose it the second time," I believe this was a
reference to the fact that GABAEE was unable to purchase the
Barnes Road Property, because it had gone into escrow with a

different buyer. At the end of this call, GABAEE and CW1 agreed to meet the following day in Westwood, California.

69. On or about April 11, 2017, there was an audio-recorded meeting between GABAEE and CW1 in Westwood. From my review of that recording, debrief with CW1, and involvement in this investigation, I know that GABAEE and CW1 met briefly inside of GABAEE's car. GABAEE noted the presence of "a lot of cameras" in the area, as if to suggest that he was uncomfortable meeting with CW1 in that specific location, and appeared to drive to a different location nearby. During this meeting, GABAEE gave CW1 the outstanding $100 that was missing from GABAEE's last cash bribe payment to CW1 on or about March 31, 2017. (Previously, on or about March 31, 2017, GABAEE had given CW1 $900 and said that he was "one hundred dollars short.") At this meeting on or about April 11, 2017, when GABAEE gave CW1 $100, GABAEE said "I owed you this, [CW1]; I was short."[25]

70. In addition, during this meeting in Westwood, CW1 gave GABAEE a copy of the DPSS lease for the Hawthorne Mall. The FBI obtained this lease from CW1, and I have reviewed it. The parties to the lease are the County and M&A Gabaee, which is a California limited partnership in which GABAEE is a partner. Public records indicate that the address for M&A Gabaee is the same as that of the Charles Company. The DPSS lease was for a period of 10 years and estimated to be worth at least

---

[25] Following CW1's meeting with GABAEE, the FBI met CW1 and collected $100 in United States currency from CW1, which CW1 said GABAEE had given CW1 during the recorded meeting.

$45,464,400.[26]

71. After CW1 handed GABAEE the $45 million DPSS lease, GABAEE responded by handing a real estate listing for a property on Annadel Heights Drive in Santa Rosa (the "Annadel Heights Property") to CW1. GABAEE said, "this is the one [on which] I'm trying to make an offer." Based on my review of this recording and the real estate listings GABAEE had given to CW1, I am aware that the Annadel Heights Property was originally listed for $1,199,000 but then later reduced to $1,095,000. The home was approximately 3,000 square feet and sat on over eight acres of land. After GABAEE showed the listing for the Annadel Heights Property to CW1, GABAEE asked, "what do you think?" CW1 responded, "it's good." GABAEE then said that he told an individual, possibly Individual 1, to "make an offer around a million twenty." Based on my review of that recording, involvement in this investigation, and training and experience, I believe that GABAEE offered to purchase the Annadel Heights Property for CW1 as a bribe, in exchange for CW1 performing official acts related to the County's DPSS lease for office space in the Hawthorne Mall.

---

[26] Based on my review of the lease and conversations with CW1, I am aware that the DPSS lease provided for base monthly rent of $324,120, with the potential for an annual increase in rent up to three percent. Accordingly, over a period of 10 years, the County was committing to pay at least $38,894,400 to GABAEE's company in rent alone, exclusive of the three percent increase. Furthermore, the lease also provided a tenant improvement allowance of $6,570,000, for which, according to CW1, the County would reimburse GABAEE's company. As such, between base rent and tenant improvements alone, the value of the lease for GABAEE's company was estimated to be worth at least $45,464,400.

72.  Following GABAEE's meeting with CW1, FBI Special
Agents intercepted a call on or about April 11, 2017 between
GABAEE and Individual 1, which I have reviewed.  The following
exchange took place:

AG:     I just picked up the lease for the County for
        Hawthorne.

        . . .

AG:     I got the lease.

IND1:   You the man.

AG:     It will be three months before the lease is signed,
        but this was a huge, huge, huge step.

IND1:   That's nice.  That's very nice.

        . . .

IND1:   I'll call [Individual 2] too, and I'll let
        [Individual 3] know that we gotta gear things back
        up for, uh, for Hawthorne for the County.
        [Crosstalk.]  I'm going to try to make that deal
        work too for us.  I just gotta talk to another
        realtor.

AG:     I appreciate that.  Yeah, we gotta get that sooner
        than later.

IND1:   Yeah, we'll talk tomorrow about it.

AG:     No more time to nickel and diming it.  Just if you
        need to get it, get it...

73.  Based on my review of this call, involvement in this
investigation, and training and experience, I believe that
GABAEE and Individual 1 were discussing the urgent need to

purchase a property in Northern California, specifically the
Annadel Heights Property, for CW1 now that CW1 had taken the
"huge step" of helping to obtain the 10-year DPSS lease for the
Hawthorne Mall.

74. On or about April 15, 2017, FBI Special Agents
intercepted a call between GABAEE and Individual 1, which I have
reviewed. Based on my review of the call and involvement in
this investigation, I believe that Individual 1 provided an
update regarding the purchase offer for the Annadel Heights
Property in Northern California for CW1. Individual 1 said, "I
put an, they're writing an offer for that house." GABAEE later
told Individual 1, "the house is really important." He
continued, "I hope they accept our offer." Individual 1 said
that he would keep GABAEE "posted."

R.    **GABAEE Makes Two Offers to Purchase the
      Annadel Heights Property as a Bribe for CW1**

75. On or about April 17, 2017, FBI Special Agents
intercepted a call between GABAEE and CW1, which I have
reviewed. Based on my review of the call and involvement in
this investigation, I am aware that GABAEE told CW1 that he was
signing an offer that day to purchase the Annadel Heights
Property as a bribe for CW1. The following exchange took place:

AG:   I'm signing that offer today.

CW1:  Oh, really?

AG:   Yeah, I have to do it myself. There's just, just no
      way around. You know what I mean?

CW1:  Yeah, alright.... If, if things go positive, we'll

just talk and figure it out.

AG: [UI] Good chance we get it.  I, I just want to make
    sure you're okay with it.

CW1: That's fine with me.

76.  Based on my review of this call and involvement in
this investigation, I am aware that, due to logistical issues,
GABAEE had to place the offer in his name.  He was unable to
place the offer in another person's or entity's name, as he had
hoped to do in order to conceal his interest in the property.

77.  Furthermore, immediately after telling CW1 that he was
signing an offer on the Annadel Heights Property, GABAEE began
discussing the possibility of more favorable terms for GABAEE
with regard to the DPSS lease.  For instance, GABAEE asked, "any
chance of getting a little more rent [from the County] up front
or no?"  GABAEE also wanted to confirm that the County, not
GABAEE, would be "paying for janitorial and utilities."  Based
on my review of this call, involvement in this investigation,
and training and experience, I believe that GABAEE was using his
attempted purchase of the Annadel Heights Property for CW1 as
leverage to get CW1 to push for more favorable and lucrative
terms for GABAEE with regard to the DPSS lease.

78.  On or about April 21, 2017, FBI Special Agents
intercepted a call between GABAEE and CW1, which I have
reviewed.  Based on my review of the call and involvement in
this investigation, I am aware that GABAEE and CW1 discussed the
status of the purchase offer for the Annadel Heights Property as
a bribe for CW1.  GABAEE said, "I signed the offer, and they

were checking my credit, making sure I can afford it." Based on my review of the purchase offers obtained from a realtor involved in the transaction and conversations with that realtor, I am aware that GABAEE ultimately did, in fact, offer to purchase the Annadel Heights Property. His first offer was for approximately $1,035,000. His second offer was for approximately $1,065,000.[27]

## V.   CONCLUSION

79.   For all of the reasons described above, there is probable cause to believe that GABAEE has committed a violation of 18 U.S.C. § 666(a)(2) (Federal Program Bribery).

/s/
_____
BRIAN C. ADKINS
Special Agent
Federal Bureau of Investigation

Subscribed to and sworn before me
this 10th day of May, 2018.


_____
ALEXANDER F. MacKINNON
UNITED STATES MAGISTRATE JUDGE

---

[27] Based on my involvement in this investigation, I understand that after SA Torbic and I approached GABAEE on or about April 25, 2017 and informed GABAEE that the FBI was aware of his efforts to bribe CW1, GABAEE's offer on the Annadel Heights Property was promptly withdrawn within hours of the FBI's meeting with GABAEE. Based on my conversations with CW1, I am also aware that, following the FBI's April 25, 2017 meeting with GABAEE, GABAEE and/or his company may no longer be seeking the same DPSS lease from the County with the terms originally negotiated with CW1.