ROBERT L. SHAPIRO – CA State Bar No. 43693
rs@glaserweil.com
GLASER WEIL FINK HOWARD AVCHEN & SHAPIRO LLP
Telephone: (310) 553-3000
Facsimile: (310) 556-2920

TENY R. GERAGOS – NY State Bar No. 316142
tgeragos@braflaw.com
MARC A. AGNIFILO (Pro Hac Vice; NY State Bar No. 2476182
magnifilo@bralaw.com
BRAFMAN & ASSOCIATES, P.C.
Telephone: (212) 750-7800
Facsimile: (212) 750-3906

MATIN EMOUNA – NY State Bar No. 2727113
Emouna & Mikhail, P.C.
MEmouna@Emiklaw.com
Telephone: (516) 877-9111

Attorneys for Defendant
ARMAN GABAEE

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

Plaintiff,

v.

ARMAN GABAEE,

Defendant.

CASE NO.: 2:18-CR-00331-GW

**OBJECTIONS TO PROBATION OFFICER'S RECOMMENDATION OF FOUR-LEVEL INCREASE PURSUANT TO UNITED STATES SENTENCING GUIDELINES § 2C1.1(b)(3)**

SENTENCING DATE: December 15, 2022

COURT: Hon. Judge George H. Wu

Defendant ARMAN GABAEE, through counsel, hereby submits his Objections to the Presentence Report.

Defendant reserves the opportunity to make additional comments at the sentencing hearing in this matter.

Date: November 17, 2022

Respectfully submitted:

By /s/ *Robert Shapiro*
ROBERT SHAPIRO
Attorney for Defendant
ARMAN GABAEE



Glaser Weil

Glaser Weil

# I.

# DEFENDANT ARMAN GABAEE'S OBJECTIONS TO THE PRESENTENCE REPORT

Defendant Arman Gabaee, through counsel, respectfully objects to the Probation Officer's proposed 4-level guideline increase based on its belief that Thomas Shepos was a public official "in a high-level decision-making or sensitive position."

A. *Overview*

The Probation Officer has recommended that defendant Arman Gabaee be sentenced to a prison term of 60 months. See Probation Officer's Letter of Recommendation (filed on November 3, 2022.) The recommended sentence includes a four-level increase pursuant to U.S.S.G. § 2C1.1(b)(3) (hereinafter, Subsection (b)(3)). See Presentence Report p. 10, hereinafter PSR. Subsection (b)(3) provides as follows:

> "(3) If the offense involved an elected public official or any public official in a high-level decision-making or sensitive position, increase by 4 levels. If the resulting offense level is less than level 18, increase to level 18."

"The burden is on the party seeking to adjust the sentence level to prove 'by a preponderance of the relevant and sufficiently reliable evidence the facts necessary to support the adjustment.'" *United States v. Herrera–Solorzano*, 114 F.3d 48, 50 (5th Cir.1997); accord, *United States v. Diaz*, 884 F.3d 911, 914 (9th Cir. 2018). Defendant Gabaee objects to that increase because the Government has not satisfied its burden of proving that subdivision (b)(3) applies here. The PSR asserts as follows:

> "Here, Shepos was a public official employed by Los Angeles County in the Real Estate Division and an agent of Los Angeles County who had significant autonomy to contractually bind Los Angeles County. Specifically, once a

> property was identified for a County department in need of space, Shepos was able to negotiate lease terms and draft lease agreements for the County and private property owners, or direct others to do so. In particular, Shepos had authority to negotiate contract terms on behalf of the County, although final contract approval lay with the Board of Supervisors, and Shepos had authority to approve, with others, change orders on contracts. Accordingly, a four-level increase has been applied." (See Presentence Report, p. 10.)

Defendant respectfully disagrees with the above assessment in that it is based on an incomplete and misleading understanding of Shepos' position and decision-making authority within the County – as shown next below. Defendant then shows that given this factual misunderstanding and based on applicable decisional law, the Government has not met its burden of establishing that Thomas Shepos (Shepos) was a "public official in a high-level decision-making" position, within the meaning of Subsection (b)(3).[1] Nor has the Government proved, alternatively, that Shepos was a "high-level" public official who was in a "sensitive" position within the meaning of that guideline provision.

The correct approach is well-settled. "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). Thus, analysis of the Guidelines' application "'begin[s] with the text of the provision and the plain meaning of the words in the text.'" *United States v. Carnell*, 972 F.3d 932, 939 (7th Cir. 2020) (quoting *United States v. Hill*, 645 F.3d 900, 907 (7th Cir. 2011)). Sentencing courts should "consider the Guidelines' Application Notes 'as part of the Guidelines themselves, and not mere commentary on them.'" *Id.* (quoting *United*

[1] Because Mr. Shepos concededly was not an "elected public official," that ground for application of subdivision (b)(3) need not be addressed.



Glaser Weil

*States v. Arnaout*, 431 F.3d 994, 1001 (7th Cir. 2005) and citing *Stinson v. United States*, 508 U.S. 36, 38 (1993)).

However, in this circumstance, application of the guideline to this defendant's sentencing "grows out of, and is bounded by, case-specific detailed factual circumstances"; the test applicable here "is in essence a factual inquiry." See *United States v. Carnell*, 972 F.3d 932, 939 (7th Cir. 2020). The correct factual context for the inquiry in this instance follows below.

B. *Shepos Position and Decision-Making Authority*

Defendant begins, as he must, with the language of the plea agreement. "Based on CW1's [Shepos'] level of seniority, CW1 had **significant autonomy** to contractually bind the County. In particular, CW1 had authority to negotiate contract terms on behalf of the County, although final contract approval lay with the Board of Supervisors, and CW1 had authority to approve, with others, change orders on contracts." (See Plea Agreement 7:12-17; emphasis added.) As Defendant shows, the highlighted phrase is not only ambiguous, but it is immediately undercut by the next sentence which correctly explains that **only** the County Board of Supervisors has the power to approve a contract and Shepos only had the power to approve change orders on already **executed** contracts.

As this Court knows, plea agreements are controlled by principles attendant to contract law. *Ricketts v. Adamson*, 483 U.S. 1 (1987); *Buckley v. Terhune*, 441 F.3d 688, 695 (9th Cir. 2006); *United States v. Medina-Carrasco*, 815 F.3d 457, 462 (9th Cir. 2015) ("For the most part, we interpret plea agreements using the ordinary rules of contract interpretation"). In addition, any ambiguity is resolved against the contract drafter – here the Government – because "the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist." *Buckley, supra*, at 695-96.

The phrase "significant autonomy" is such an ambiguous term. To the extent the Government meant Shepos could engage in negotiating the terms of a lease





Glaser Weil

agreement **which then had to pass through and survive several levels of government scrutiny** before the County Board of Supervisors approved the contract, Defendant agrees. Indeed, as noted above, the very next sentence clearly spells out that **only** the County Board of Supervisors has the power to approve a contract. Plea Agreement 7:15-17. Thus, under the terms of the plea agreement, Shepos had very **limited and doubtful** authority to act alone – only with regard to negotiating terms of a proposed contract or approving change orders to an already approved contract. It follows that the plea agreement does not satisfy the Government's burden to prove that Shepos was a high-level decision-maker, as required by Subsection (b)(3). Nor, was Shepos in a position to directly influence the decision-maker – the County Board of Supervisors – because his role was at least two levels attenuated and isolated from the ultimate decision-maker.

This is the process of how leases come about in Los Angeles County. First, a department – here mental health – comes up with a hypothetical request, i.e., a new program that needs to hire some number of new employees and needs two new locations. Next, the CEO level of the department approves the request. That approval is then submitted to the County's Real Estate Division and a discussion ensues. Real Estate Lease Acquisition would start searching out locations that meet the needs of the public, with respect to such requirements as parking, proximity to public transportation, etc.

Real estate owners then submit their conforming properties for consideration by the County. The County Real Estate Division may then provide one or two candidate properties to the User Department group which tours the spaces and reviews the rates. A final selection then is made by the User Group to approve a specific location.

Thereafter, the Real Estate Division lease acquisition section personnel – including Shepos – would assign a real estate agent/County employee to draft the letter to the County Board of Supervisors. The entire package would then be





Glaser Weil

presented to the County Board of Supervisors to be placed on the agenda for Board approval. As this process shows, Shepos' position is – at best a mid-level county functionary with only limited authority to negotiate the terms of a lease which then goes through several levels of additional scrutiny before it is presented to the ultimate decision-maker – the County Board of Supervisors – for approval and contract execution. In short, Shepos had no actual decision-making authority; he only supplied limited input; it is the Board that decides whether to approve the contract.

C. *The Government Has Not Proved Shepos Was a High-Level Decision-Maker for the County*

To begin with, Mr. Shepos' clearly was not a high-level decision-making public official within the meaning of Subsection (b)(3). The PSR describes him, without further elaboration as "a public official employed by the County in the Real Estate Division." PSR, p. 6. The PSR goes on to characterize his job as involving negotiating property leases for Los Angeles County with private entities. Offering scant pertinent detail, it is claimed he enjoyed "significant autonomy to contractually bind the County," accompanied, however, with the apparently contradictory acknowledgment that "final contract approval lay with the Board of Supervisors." Thus, although Shepos had authority to approve change orders on contracts, the PSR admits that he required the approval "with others . . . ." *Id.* As discussed in section B, *ante,* it was only after multiple levels of scrutiny by the User Group and the Real Estate Division that the negotiated contract would be submitted to the County Board of Supervisors for its approval, and only the Board had decision-making power.

The Government has not met its burden of proving that Shepos had "direct authority to make decisions for, or on behalf of, a government department, agency, or other government entity." See Commentary to § 2C1.1(b)(3). Instead, the evidence shows that a lengthy and complex process thoroughly vetted by others was required on any leasing recommendations submitted by Shepos. Shepos' position,



Glaser Weil

accordingly, was by no means analogous to – nothing like – those given by the Commentary as examples of "a high-level decision-making position": to wit, "a prosecuting attorney, a judge, [or] an agency administrator . . . ." Nor can the Government show that Shepos had "a similar level of authority" to such officials as contemplated by subdivision (b)(3) of the guideline.

The inquiry focuses on Shepos' "*individual* ability to make decisions or influence decision-making." *United States v. Richards*, *supra*, 674 F.3d at 222 (italics added). Yet, in this case it is clear that Shepos was not a "high level" decision maker because he could not make leasing decisions without the approval of several levels of scrutiny, ultimately culminating with the County Board of Supervisors who approved and executed contracts. See *United States v. Alter*, 788 F.Supp. 756, 767 (S.D.N.Y.1992) ("Alter lacked the legal authority to impose major disciplinary sanctions without referring the discipline cases to his superiors. Although Alter possessed a sensitive position, some degree of discretion, and de facto authority, these characteristics do not render one a 'high-level' government official"). "Another important mark of high-level responsibility is the existence of discretion involving final decision-making authority over matters of public policy or over the expenditure of substantial sums of money." *United States v. Snell*, 152 F.3d 345, 347 (5th Cir. 1998). Here, Shepos lacked such high-level and final decision-making authority.

The Government is left with the fall-back argument that Shepos, in the alternative, was a "public official in a high-level . . . *sensitive* position" under subdivision (b)(3). Italics added. However, the Government's evidence is deficient in that respect as well.

D. *The Government Has Not Proved Shepos Was a High-Level Public Official Who Occupied a Sensitive Position*

At the outset, it is clear that Shepos, as a County employee, was not "similarly situated" to "a juror, a law enforcement officer, [or] an election official," -- the examples given by the Commentary of a public official who holds "a sensitive





Glaser Weil

position." To show that Shepos' position qualifies so as to make subsection (b)(3) applicable to determining Gabaee's sentence, the Government's showing must delve more deeply. See *United States v. Stephenson*, 895 F.2d 867, 877-78 (2d Cir. 1990) (holding Guideline subsection 2C1.1(b)(2) does not apply because although "Stephenson's duties involved some degree of discretion and required him to possess a security clearance [that] does not set him apart from a multitude of personnel in the federal service").

Crucially, whether Shepos' position meets the requirements specified by the Guideline turns not on over-simplified characterizations or speculations about its *theoretical* scope, but instead depends on what the evidence shows was Shepos' "*actual authority*," over the leasing process. *United States v. Hill*, *supra,* 645 F.3d at 907 (italics added). That inquiry requires the district court's "factual findings at sentencing" for its determination. *Id.* As shown by the facts discussed in part B, *ante*, here as in *Stephenson*, Shepos did not have the required "direct authority," or even the "substantial influence over the decision-making process," to "set him apart from the multitude of personnel" the County's Real Estate Division. 895 F.2d at 878.

The Seventh Circuit's opinion in *United States v. Hill*, *supra*, while reaching a different conclusion than that warranted by the Government's evidence in Gabaee's case, nonetheless provides a helpful framework for analysis. In *Hill*, the Court of Appeals found the district court did not err by finding subdivision (b)(3) satisfied when although the mayor had the ultimate authority, defendant "exercised substantial influence over the decision-making process," in the issuance and renewal of liquor licensing in the East St. Louis area, because the evidence showed "'Hill was the [m]ayor's eyes and ears on liquor in the East St. Louis area,' and the '[m]ayor basically deferred to him ... so everything went through ... Hill.'" 645 F.3d at 906. That certainly cannot be said of Gabaee and the Los Angeles County Board of Supervisors.



Glaser Weil

Reinforcing the showing of Hill's actual authority in licensing matters was that he held "a sensitive position comparable to law enforcement function." *Id.* Hill "wore a badge and had the authority to direct license holders to make changes within their establishments to comply with the liquor code. He also had the authority to cite businesses with violation reports, which triggered a disciplinary procedure that could result in sanctions." *Id.* Further, there was evidence that, "'the [m]ayor does not really know what he is doing in reference to liquor licenses,'" and "didn't provide meaningful supervision over Hill in the execution of his duties." *Id.*

Here, in contrast, Shepos' role was limited to negotiating with private property owners as to the terms on a contract which then was submitted to the User Group and Real Estate Division for scrutiny **before** it was submitted to the Board of Supervisors for its approval. In short, Shepos' role was too attenuated and insulated from the Board of Supervisors to constitute a "sensitive position" of influence.

Thus, as distinguished from the record in *Hill*, the Government cannot show here that Shepos had anything comparable to the "substantial influence" possessed by Mr. Hill. Certainly, it cannot be said that the User Group and Real Estate Division "does not really know what [they] are doing" with respect to leasing property for the County's use, and that these County agencies failed to carry out their duties by merely rubber-stamping Mr. Shepos' recommendations. The Government has not established that there were any failures by the relevant agencies that allowed Shepos "to blatantly flaunt and misuse his power for personal benefit," as was true for Mr. Hill. *Hill*, *supra*, 645 F.3d at 907. And Shepos did not wear a badge and certainly could not issue citations or give orders -- but Hill could.

In a nutshell, Gabaee's case is not one where the bribed official "possess[ed] unreviewed power over important public decisions," to justify deeming he held "a sensitive post" within the Guideline's meaning. (See *United States v. Stephenson*, *supra*, 895 F.2d at 877-78 (holding enhancement does not apply because although "Stephenson's duties involved some degree of discretion and required him to possess





Glaser Weil

a security clearance [that] does not set him apart from a multitude of personnel in the federal service"). Unlike cases that have upheld application of subdivision (b)(3), here it cannot be said that Shepos' recommendations "were scarcely scrutinized, giving him de facto control over" County leases. Cf, *United States v. Johnson*, 874 F.3d 990, 1003 (7th Cir. 2017). Nor does the Government's evidence prove that because "only a handful of [Shepos'] decisions were ever reviewed, he had near total control over," county leasing. Cf. *United States v. Reneslacis*, 349 F.3d 412, 415 (7th Cir.2003).

The Government's evidence, in short, has failed to satisfy its burden of proving the facts necessary to warrant imposing the four-level enhancement of subdivision (B)(3) on this defendant.

## II.

## THE COURT SHOULD FIND THAT THE FOUR-LEVEL ENHANCEMENT CONTEMPLATED AT § 2C1.1(B((3) IS UNWARRANTED AND SHOULD NOT BE APPLIED

For the reasons set forth above, the four-level enhancement should not be applied here based on "an individualized assessment based on the facts presented." See *Gall v. United States*, 552 U.S. 38, 50 (2007).

DATED: November 17, 2022

Respectfully submitted,

By: /s/ Robert Shapiro
ROBERT SHAPIRO
TENY R. GERAGOS
MARC AGNIFILO
MATIN EMOUYNA
Attorneys for Defendant
ARMAN GABAEE





Glaser Weil